UNITED STATES of America,
Plaintiff-Appellee,

v.

Harriet Ann IMPINK,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard D. BOLANOS,
Defendant-Appellant.

Nos. 83–5077, 83–5079.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1983.

Decided March 19, 1984.

---

Hector E. Salitrero, Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Hector E. Salitrero, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Phillip A. DeMassa, John Y. Tremblatt, San Diego, Cal., for defendants-appellants.

Before FLETCHER and NELSON, Circuit Judges, and HARDY,* District Judge.

NELSON, Circuit Judge:

Defendants appeal from a conviction to manufacture and possess with intent to distribute a controlled substance. They argue that they were subjected to an improper warrantless search, justified by neither consent nor exigent circumstances. Additionally, they contend that the evidence was insufficient to support the convictions. Persuaded that the initial police entry was improper, we reverse on that ground and do not reach the sufficiency of the evidence issue.

* Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 1982 Monique Guilbault leased a house in Jamul, California, to Richard Bolanos. At the time of the lease, the parties orally agreed that Guilbault would be permitted to store a space heater in the garage adjacent to the house.[1] At 4:00 p.m. on October 18, 1982, Guilbault and a friend, Edward Blinks, went to the property to retrieve the heater from the garage. While approaching the house, they looked through the partially opened garage door and noticed a variety of glasses, flasks, and burners. Guilbault and Blinks then sought permission to enter the house. Harriet Impink answered the door and invited them to enter. When Guilbault and Blinks hesitated momentarily, Impink told them that they were on private property and asked them to leave. They left, drove to the nearby residence of a police officer, Richard Davis, and telephoned the Narcotics Task Force to relay what they had seen.

Two narcotics agents, Kim Nelson and Dale Kitts, immediately set out to interview Guilbault and Blinks personally. While at Davis' house, the officers discussed whether they needed a search warrant. Before a search warrant had been procured, the officers saw Bolanos drive by in a pick-up truck, heading toward his leased house. The officers decided to investigate further. At 6:05 p.m., they arrived at Bolanos' house.

Bolanos' driveway was protected by a locked wooden fence with a "Beware of Dog" sign posted on it. A deputy walked around the fence and unlocked it from the inside. On their way to the front door, the officers saw two large fans in the west window of the garage and a corrosive liquid running down the windowsill. These observations suggested to Agent Kitts that a clandestine laboratory was in operation. He walked to the garage window, looked in, and saw a number of flasks, a black air-mask, and another fan.

The officers then went to the front door. When Bolanos answered the door, the officers identified themselves and told him what they had seen. Impink then entered from an adjoining room and spontaneously declared that she knew nothing about the garage. Bolanos allowed the officers to enter the house, but insisted that Guilbault had had no right to look into the garage. When asked, Impink consented to a search of the house, but specifically denied consent to enter the garage.

The agents searched the house, finding it bare except for scattered articles of clothing. Shortly thereafter, Bolanos' lawyer called the house and told the agents that if consent to search had been granted, it was now being revoked. Additionally, he instructed the agents not to interrogate Bolanos or Impink. The agents discontinued their search and questioning, but held the defendants in the living room for over two hours while awaiting issuance of a search warrant.[2]

After obtaining a search warrant by telephone, the agents searched the garage. They discovered a laboratory containing 50 pounds of methamphetamine in various stages of production.

Bolanos and Impink were indicted on November 5, 1982, for conspiracy to manufacture and possess with intent to distribute a controlled substance, manufacturing a controlled substance, and possession of a controlled substance with intent to distribute. Defendants' motions to suppress were denied on December 22, 1982. All of the facts were stipulated before the trial court, and appellants were convicted of one count on February 16, 1983. Notices of appeal were filed on April 4 and 14, 1983.

## DISCUSSION

These cases raise a number of difficult fourth amendment issues. A threshold question, however, is whether the narcotics agents were justified when they went on to Bolanos' property without first procuring a

---

1. Since the house and garage are both on one lot, protected by one gate, and governed by one lease, we treat them as being analytically identical for the purposes of this opinion.

2. Attorney Tremblatt called at 6:18 p.m. The search warrant was issued at 8:50 p.m.

warrant. Since we find that this initial entry was improper, we need not reach the remaining issues.

■ Generally, police should secure a warrant before searching someone's property. *E.g., Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967). If the police had obtained a warrant in this case, these convictions would easily stand: A landlady goes to her leased property to retrieve a heater she has stored there. She sees flasks and beakers set up in the garage, and suspects that her lessees may be engaging in illegal activity. Concerned, she reports to the police what she has seen. In a perfect world, the police use this information to obtain a search warrant. Warrant in hand, they go to the house, search it, and the suspects are apprehended.

Here, however, the police chose not to obtain a warrant. Instead, they simply entered the premises. Now, after the fact, they argue that the illegal laboratory was hazardous and posed a threat to the community. Additionally, they argue that they did not have to obtain consent from the suspect whose premises were to be searched, but could simply infer consent from the landlady's actions. We reject each of these rationalizations. Where the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.

## I. *Exigent circumstances.*

■ The government argues that the presence of a methamphetamine laboratory on Bolanos' property constituted an exigent circumstance. The possibility that the laboratory might explode, it is argued, justified a warrantless entry by the police to secure the premises. *See, e.g., United States v. Williams,* 630 F.2d 1322, 1327 (9th Cir.), *cert. denied,* 449 U.S. 865, 101 S.Ct. 197, 66 L.Ed.2d 83 (1980). The district court was convinced by this reasoning. We review the decision below *de novo* and reverse. *See United States v. McConney,* 728 F.2d 1195 (9th Cir. 1984) (en banc).

■ When the police originally decided to approach Bolanos' residence, they did not know that an operational methamphetamine laboratory was on the premises. They had been told only that there were glasses, flasks, and beakers in a garage. Guilbault never hinted that the laboratory was in use or gave any indication that the lab was used to manufacture illegal drugs. To hold that the mere presence of flasks and beakers constitutes an exigent circumstance would be to hold every chemical laboratory in the country open to warrantless search. We have declined to do this before, *see United States v. Crozier,* 674 F.2d 1293, 1298–99 (9th Cir.1982), and we decline to do so now.

■ Additionally, the government argues that when Bolanos was seen driving toward his house, this raised the possibility that he would destroy evidence of crime. This exigency supposedly justified immediate entry by the police. We reject this justification. For destruction of evidence to constitute exigency, evidence must be present that could be destroyed. *See United States v. Glasby,* 576 F.2d 734, 737–38 (7th Cir.), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978). The mere suspicion that evidence may be present does not justify entry by the police; rather, there must be a "finding of probable cause coupled with exigent circumstances." *United States v. Stanley,* 545 F.2d 661, 664 (9th Cir.1976). Thus, to establish exigent circumstances due to the possible destruction of evidence, the state must demonstrate probable cause to suspect that evidence was present at Bolanos' residence.

It is a close question whether the presence of flasks and beakers in Bolanos' garage constituted probable cause to search. If, before the fact, the police had submitted these facts to a magistrate, a warrant might have issued. On the other hand, here the police were not certain that a warrant would issue. In any event, they chose not to obtain one. Now, after the fact, contraband has been discovered and the state asks us to conclude that probable cause must have existed. The propriety of a search, however, is unrelated to the results it later

yields. To hold otherwise would legitimize any search as long as it ultimately revealed evidence of illegality. *See, e.g., Blefare v. United States,* 362 F.2d 870, 881 (9th Cir. 1966) (Ely, J., dissenting) (a particularly eloquent expression of this basic proposition).

Where the existence of probable cause is a close question and the police had ample opportunity to obtain a warrant in advance, we are bound to disfavor the state's later contention that probable cause existed. *See United States v. Brown,* 584 F.2d 252 (8th Cir.), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1978). Here, a magistrate could easily have been consulted in advance to decide if probable cause existed. This was not done. Thus, we find that probable cause was not present, and there was no exigency posed by the possible destruction of evidence.

## II. *Consent.*

If the presence of a methamphetamine laboratory does not constitute exigency, the government argues that Guilbault, the landlady, implicitly consented to the agents' search of the garage. The district court accepted this argument, finding that implied consent circumvented the warrant requirement. *United States v. McConney,* 728 F.2d 1195 (9th Cir. 1984) (en banc), casts some doubt on the standard of review applicable to this issue. Since we would reverse under any standard, we need not pause here to resolve the standard of review question.

Generally, a lessor cannot consent to a search of leased premises. *E.g., Stoner v. California,* 376 U.S. 483, 489–90, 84 S.Ct. 889, 893–94, 11 L.Ed.2d 856 (1964); *Chapman v. United States,* 365 U.S. 610, 616–18, 81 S.Ct. 776, 779–80, 5 L.Ed.2d 828 (1961). However, to the extent that a lessor has the right to enter a room, he can authorize entry by the police. *See United States v. Sledge,* 650 F.2d 1075, 1080 n. 10 (9th Cir. 1981) (dictum); *see also United States v. Gradowski,* 502 F.2d 563 (2d Cir.1974) (*per curiam*). Here, the parties stipulated that "Guilbault had reserved the right to store certain property in the garage of the residence." The court below credited Agent Kitts' testimony that Guilbault could retrieve the property at any time. From this evidence, it reasoned that Guilbault could consent to a search of the garage.

The parties acknowledge that Guilbault was never explicitly asked to consent to a search and never volunteered consent. Rather, they argue that by calling the police and cooperating with the investigation, Guilbault gave implied consent.

### A. *Establishing Effective Consent.*

The government always bears the burden of proof to establish the existence of effective consent. *E.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Whitten,* 706 F.2d 1000, 1016 (9th Cir.1983). This burden is heavier where consent is not explicit, since consent "is not lightly to be inferred." *United States v. Patacchia,* 602 F.2d 218, 219 (9th Cir.1979). Under some very limited circumstances, however, courts will infer consent from the cooperative attitude of a defendant. *E.g., United States v. Griffin,* 530 F.2d 739, 743 (7th Cir.1976) (consenter answered the door and stepped back, leaving the door open and leading officers into apartment); *United States v. Katz,* 238 F.Supp. 689, 695 (S.D.N.Y.1965) (consenter assisted in the search). Here, we are asked not only to infer consent, but to do so from the actions of a third party.

The most recent Supreme Court decision on third party consent searches is *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There, the defendant was arrested in the yard of the house in which he lived and taken to a squad car some distance away. Instead of seeking the defendant's consent to a search of the house, the police asked a Mrs. Graff, who shared the apartment with defendant, if they could enter, and searched the house on the basis of her consent. The court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is

shared." *Id.* at 170, 94 S.Ct. at 992. The opinion was explicitly limited to situations where "persons generally hav[e] joint access or control for most purposes." *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

[11] *Matlock* thus leaves open three possible variables in the consent calculus. First, the third party may not generally have "joint access ... for most purposes"; his right of access may be narrowly prescribed. Second, the objector may not be an "absent ... person"; he may be present at the time third party consent is obtained. Finally, the objector may not simply be "nonconsenting"; he may actively oppose the search. Each of these variables has been altered between *Matlock* and the case before us, and each change suggests that effective consent could not be given in this case. Additionally, the explicit consent in *Matlock* is changed to implied consent here.[3] Under these circumstances, we find that Guilbault did not effectively consent to a search of the house.

### B. *Factors to be Considered.*

#### 1. *Unequal rights of access.*

This case presents a situation where the third party and the defendant did not have "equal use of a place in which both are present." Weinreb, *Generalities of the Fourth Amendment*, 42 U.Chi.L.Rev. 47, 63 (1974). Rather, Bolanos was the lessee of a house (and the garage adjacent to it) and Impink was on the premises as a full-time caretaker. Both had an unlimited right to be on the premises at any time. Guilbault, the lessor, had reserved only the limited right to enter the garage to retrieve her stored property. As between the resident and a lessor with a narrowly proscribed right of access, there can be no doubt that the resident has the greater right of "access or control for most purposes."[4] *United States v. Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

Moreover, it is likely that Guilbault's right of access here was yet more limited than it appears at first glance. The agreement that permitted the landlady to re-enter the garage was oral. Even if we accept the district court's finding that a right to re-enter existed, we need not interpret an informal oral agreement as conveying an unlimited right of access. The lessor is alleged to have implicitly consented not only to entry by the police to retrieve stored goods, but entry without notice, outside of normal business hours. It is most unlikely that an informal agreement that the lessor could retrieve her property from the garage could be construed to permit surreptitious entry into the garage at midnight. Obviously there are some limits on the right to re-enter; a right limited to entry during normal business hours with adequate notice to the tenant is most plausible. Police should rarely seek consent from third parties who possess such limited rights of access. *See Chapman v. United States*, 365 U.S. at 616–18, 81 S.Ct. at 779–80; *Padron v. State*, 328 So.2d 216 (Fla.App.), *cert. denied*, 339 So.2d 1172 (Fla.1976).

#### 2. *Presence of the objector.*

At every step of the investigation in this case, a person with a privacy interest superior to Guilbault's was present during the search.[5] When Guilbault first approached the house, Impink answered the door and asked her to leave. When the police later decided to approach the house,

---

**3.** In most implied consent cases, the suspect himself takes some action that implies consent—he gestures to the police to enter, *e.g., People v. Harrington*, 2 Cal.3d 991, 995, 88 Cal.Rptr. 161, 163, 471 P.2d 961, 963 (1970), or assists in the search of others. In those cases, we have found that consent was "unequivocal and specific." *See United States v. Page*, 302 F.2d 81, 83 (9th Cir.1962). Here, in contrast, we are asked to infer consent from the actions of a third party—a most uncommon situation. Moreover, the person whose consent is to be inferred was not present at the time of the

search. Guilbault remained at the Davis house while the police investigated.

**4.** This determination is based on actual expectations of privacy rather than common law definitions of property rights. *See United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974).

**5.** It hardly bears noting that police may not arrest a suspect solely to prevent his presence at the time consent from a third person is sought.

they did so because they saw Bolanos drive to the house. Thus, the police knew that the lessee of the house was present when they began to search. We do not hold that police must invariably seek consent from the suspect before relying on a third party's consent. However, when the police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain. *See Silva v. State,* 344 So.2d 559, 562–63 (Fla.1977); *Hembree v. State,* 546 S.W.2d 235, 241 (Tenn.Cr.App. 1976); *Tompkins v. Superior Court,* 59 Cal.2d 65, 378 P.2d 113, 27 Cal.Rptr. 889 (1963).

3. *Active objection versus mere noncon-sent.*

 A third factor suggesting that Guilbault could not give effective consent is Impink's request that she leave the premises. Guilbault's authority to consent in her own right "does not go so far as to outweigh an equal claim to privacy by a co-occupant on the scene." W. LaFave, 2 *Search and Seizure* § 8.3 at 708 (1978). Balancing a claim to privacy by a full-time caretaker with a claim by a lessor is a difficult task. Even without engaging in precise balancing, however, we conclude that Impink's objection casts doubt on Guilbault's consent. *See Silva v. State,* 344 So.2d 559 (Fla.1977); *Lawton v. State,* 320 So.2d 463, 464 (Fla. App.1975); Weinreb, *supra,* at 63.

C. *Effective Consent Could Not Be Inferred Under These Circumstances.*

 In some cases, courts have invalidated searches solely because the consenting person had an insufficient right of access to the premises. *See, e.g., People v. Carswell,* 149 Cal.App.2d 395, 308 P.2d 852 (1957) (police admitted by housepainter; search invalid). Our holding here, however, need not reach so far. Rather, we view the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), and conclude that effective consent was precluded by the combined elements of this case. Where a suspect is present and objecting to a search, implied consent by a third party

with an inferior privacy interest is ineffective. *See, e.g., Lucero v. Donovan,* 354 F.2d 16 (9th Cir.1965) (permanent resident's objection vitiates part-time resident's consent); *Padron v. State,* 328 So.2d 216 (Fla. App.1976) (son cannot consent when parent present and objecting); *Hembree v. State,* 546 S.W.2d 235 (Tenn.Cr.App.1976) (son cannot consent when parents present); W. LaFave, 2 *Search and Seizure* § 8.3 at 709 (1978). Absent effective consent, the police could not search Bolanos' garage without a warrant. That search was illegal and all that followed from it must be excluded.

CONCLUSION

The presence of flasks and beakers in Bolanos' garage did not constitute an exigent circumstance justifying warrantless entry onto his property. Guilbault's right to re-enter the garage to retrieve her property was limited in scope and was not effectively conveyed by implication. Thus, the initial entry by the police onto Bolanos' land was an improper warrantless entry. All that followed from that entry must be suppressed. Accordingly, the convictions are REVERSED.