UNITED STATES of America, Plaintiff,

v.

Loren Adrian SEALEY, Defendant.

No. CR F 85–108–EDP.

United States District Court, E.D. California.

March 6, 1986.

Donald B. Ayer, U.S. Atty., Brian C. Leighton, Asst. U.S. Atty., Fresno, Cal., for plaintiff.

Mike A. Karagozian, Fresno, Cal., for defendant.

## MEMORANDUM DECISION RE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.

PRICE, District Judge.

On June 19, 1985, Deputy Gary Healy of the Fresno County Sheriff's Office was on patrol in the Sanger area. At approximately 11:30 a.m. of that day, Healy received a dispatch informing him that a female was

being beaten and that there was also a weapon in the house at 2127 Greenwood Avenue, Sanger, California, the site of the alleged battery. Healy proceeded directly to this address and was met at the door by the defendant Sealey and his wife, Julie. Julie appeared distraught and upset. She did not appear to be under the influence of alcohol.[1] Healy accompanied Julie Sealey, the complaining witness, into the kitchen, and the defendant was taken by another officer into the living room and placed on a couch.

While in the kitchen with Healy, Julie stated that she had been beaten by her husband and kicked by him. She wanted him out of the house and requested that he be arrested. Healy advised her that the Sheriff's Office could not arrest him because they had not witnessed the incident, and proceeded to instruct her that she would have to perform a citizen's arrest for him to be taken into custody, and as to how the procedure should be undertaken. She placed her husband under citizen's arrest. After obtaining some clothing for the upper part of his body from the bedroom, he was accompanied to a Sheriff's squad car and placed therein. The record is not clear when he was transported to the Fresno County Jail.

After this had been accomplished, Julie confided in Healy that there was a gun in the house, and that she was afraid that her husband would be released from jail, return to the home and harm her with the gun. She related that she knew where the gun was located. Julie and Healy then went into the bedroom to retrieve the gun. She showed him where she believed the gun was located, but he could not find it there. Healy continued the search in the bedroom and saw a travel bag which was half zipped. Through the opening he could see white envelopes. Without objection from Julie, Healy unzipped the bag reveal-ing several white envelopes in the bag. Julie's response was, "Oh, God." Healy then inquired as to what the envelopes contained, and she replied, "Money." He then admonished her, "You're going to have to be honest with me." Julie said nothing in response, but picked up a cigarette case and pulled out some white powder. Again Healy asked, "What's this?" Julie answered, "Crank, and the money is from crank."[2]

At that point, Healy discontinued the search for the gun and contacted his superior, Sgt. Tafoya. Healy then followed Julie to the kitchen where she had gone to retrieve her two year old son, Loren, Jr. While in that area, she voluntarily showed him some marijuana contained in a coffee can. The infant son of the Sealeys was roaming the house at will. Healy's concern for his safety prompted his statement to Julie that he was going to continue his search for the gun rather than more contraband. Healy returned to the bedroom and continued the search for the gun. He ultimately found it between the mattresses on the bed and seized it. He returned to the kitchen and Sgt. Tafoya arrived for the second time.

Upon being apprised of what Healy's limited search had uncovered, Sgt. Tafoya concluded that the matter was more properly in the jurisdiction of the narcotics detail and contacted his office for help. In addition to contacting the narcotics squad for help, Tafoya sought the advice of the Fresno County Sheriff's legal advisor, who instructed him on the legal requirements for a valid consent search. No further search was undertaken, and Healy was left to aid the narcotics officers who had arrived.

The next Sheriff's Officer who figures in this matter and arrived was Deputy Mike Stanford, a Detective detailed to the Narcotics Division. He arrived at approximately 12:50 p.m. Upon his arrival, Sgt. Tafoya

---

1. By insinuation, defense counsel suggested that Julie Sealey was intoxicated on the day in question. She denied it, and none of the Officers who were at the scene noted that she appeared to be under the influence of alcohol or drugs.

2. Julie, of course, denies this version of the events in the bedroom. The Court addresses the issue of witness credibility later in this memorandum.

related a summary of the prior events, including that they had found large amounts of cash, a substance identified as crank, and allegedly some marijuana. Stanford contacted Healy who was in the kitchen with Julie, and who corroborated the information given him by Tafoya. Healy also told Stanford that Julie had given her consent for the Officers to search the residence for narcotics.[3] He inspected the unopened envelopes in the canvas bag. He noted that Julie appeared to be upset, but showed no evidence of either drunkeness or being under the influence of drugs. He then spoke with Julie and established that she lived there with her husband, the defendant, that they were purchasing the property and that she had unlimited access to all areas. He asked her if there were any areas of the premises that she would like to refuse the Officers the right to search. Her reply was, "Go ahead with your search". She further indicated she did not know what the Officers would find, "but feel free to search".

However, on cross-examination by defendant's counsel, Stanford testified as follows:

Q At sometime, Officer, you asked Julie about the garage area; isn't that right?

A Yes, I did.

Q What did she tell you about the garage area?

A She stated that she did not know what was in there and that Loren would not let her go in unless he was around or if he was going to obtain a tool or something like that.

Q You understood that to mean before she could go in there to even get a tool she had to have Loren's consent; is that right?

A I asked her if.

Q Yes or no, please.

A Yes

On re-examination the matter was explored further by the Assistant U.S. Attorney.

Q You had a conversation with Julie Sealey about the garage, correct?

A Yes

Q Did she mention something about unless she was to go into the garage to get a tool, Loren wouldn't let her go in there?

A Ah, huh.

Q Did you have any other conversation with her?

A Basically, if she wanted to go in there, she could go in, and it was just basically Loren would become angry with her, but she could go in there.

No search was undertaken at that point; Stanford was awaiting the arrival of Detective Meyers.

On Meyers' arrival at about 1:30 p.m., he conferred with Officer Healy and Sgt. Tafoya as to the previous incidents. He then confirmed from Julie that Julie consented to a search of the premises. He then asked Julie to join him at the kitchen table, where he questioned her about her marriage to the defendant, the amount of access she had to the residence, garage and surrounding grounds, and was she a 50 per cent owner of the residence. As she answered his inquiries, he incorporated her answers into a written consent in his own handwriting (Government's Exhibit A, in evidence). He read the document to Julie and explained to her that she could withdraw her consent to the search at any time. During the conversation, Julie indicated that her husband was employed part time, but that he had taken his pay in cash and had filed no tax return since his release from prison. Significantly, the record does not indicate there was ever any discussion between Julie and the Officers as to what objects the Officers would be searching for, nor was Julie's consent limited in any manner as to specific objects. At the time the consent

---

**3.** Healy testified that he never requested permission from Julie to search the premises for narcotics. His conduct in recalling Tafoya for help, and Tafoya's response would appear to corroborate this. Julie did give Healy information about the presence of narcotics elsewhere on the premises.

form was filled out, the Officers were aware of a gun, small amounts of controlled substances and an unknown quantity of cash.

During the preparation of the consent form, Julie informed the officers that her husband would force her to testify that she granted the consent only because she was pressured into doing so.[4]

Stanford and Healy witnessed the preparation of the consent form and Julie's signature. They corroborated Meyers testimony on this point. The consent is annexed hereto as Appendix I.

One of the first things that was done after the search commenced was to inventory the cash that was contained in the travel bag. Because of the amount of cash inventoried, Meyers called the State Franchise Tax Officers and called the Federal Drug Enforcement Administration Agent Kromberg.

The search resulted in significant amounts of controlled substances being seized in addition to the bag of money. The inventory of the property seized as a result of the search is contained Government's Exhibit B. (Appendix II to this Memorandum)

In response to Detective Meyers' call, Tax Compliance Representative Lurane Van Norwitch of the Franchise Tax Board of the State of California arrived at the residence. According to the information which she received from the Sheriff's Officers engaged in the search, she made a jeopardy assessment against the defendant in the amount of $169,754.00. In aid of the jeopardy assessment, she issued a warrant to seize two vehicles, one boat and one trailer. She gave the warrant to Detective Meyers and instructed him to execute the same. He in turn instructed one of his officers to inventory the contents of the vehicles incidental to the search.

In the course the of inventory of the vehicles, Deputy Tagliamonte of the Clovis Police Department obtained access to the trunk of a Bertone automobile in which he noticed a small canvas bag. The canvas bag contained a weapon which had a detachable stock and several clips of ammunition that fit the weapon in the bag. It was later determined that the weapon could be fired fully automatically and thus was seized as an illegal unlicensed machine gun. The possession of this weapon constitutes the basis for the third count of the indictment returned against the defendant in this matter.

The search of the residence and the garage produced a substantial amount of contraband, principally methamphetamine. It was found in boxes in the attic over the bedroom occupied by the defendant. More was found in sealed PVC pipes in the garage.

The defendant was charged in state court with a violation of the California Penal Code Section that forbids an exfelon to possess a gun. These charges were dismissed after a preliminary hearing. In the instant case, the defendant is charged in a three count Indictment. After the search was completed, it was determined by the law enforcement personnel that Julie's safety required her to be kept in form of protective custody. Julie soon tired of this arrangement and returned to her home in Sanger.

Subsequently, the defendant was released from custody and stringent conditions of release were imposed upon him by the Magistrate. One of the conditions of release specified that:

(g) Avoid all contact with his wife Julie Sealey. Julie's testimony indicated that this condition of release has been violated.

## CREDIBILITY OF WITNESSES

In judging the affectivity of the consent to search, the first issue that confronts the

---

**4.** Julie's prediction in this regard was not fulfilled. In substance, she testified that the search proceeded for hours without her consent, and when completed she was presented with the consent and inventory of property seized. In her words ... "it had been all day long, and I didn't really care what I was signing ... It was almost dark".

Court is passing judgment on the credibility of the witnesses.

The operations at the Sealey residence on June 19, 1985, extended over a period of eight hours. During that period of time numerous Officers came and went. Several Officers filed reports of their activities and what they saw and heard. As frequently the case in such situations, the reports and present recollection of the Officers contained inconsistencies which have been emphasized at length in the energetic representation of the defendant. However, the critical details necessary to weave together the story of what happened here are remarkably consistent. Further, there was testimony by Officers who played a peripheral role in the overall operation to the effect that Julie had stated independently that she had consented to the search. Inferentially these statements were made prior to the time that Julie now contends the consent was submitted to her for her signature.

While the testimony of Julie is generally consistent with the testimony that she gave at the preliminary hearing in State Court on September 18, 1985, the Court does not find that fact standing alone establishes Julie Sealey as a credible witness for the following reasons: Julie Sealey never has denied that she requested Officer Healy to search for the gun and to take it into custody. Her story that this original search never ceased is not corroborated by any other witness.

■ After discovery of the contraband the Officers had sufficient probable cause to secure the residence and to seek a search warrant. It is clear from the testimony of several Officers that the reason they did not follow this route is because they had a honest belief that they had complied with the law pertaining to consent searches.

---

5. It is not clear when the Officers became aware of the defendant's prior record.

6. The United States Supreme Court has long since moved from earlier suggestions that a valid consent search—whether consent be granted by the suspect or a third person—required a

■ Further, by the time this matter came on for evidentiary hearing in Federal Court, on November 18, 1985, the record indicates the defendant had violated the conditions of his release on several occasions and had spent the night with his wife at the Sanger residence and presumably planned his defense.

### THE VALIDITY OF THE CONSENT SEARCHES

At the outset it must be noted that two distinct searches took place in this case, and that neither was based upon the consent of the person upon whom the suspicion of probable guilt had been fixed.

The first search—the search for the gun—was by request rather than consent. At the time the Officers arrived at the home of the Sealeys in response to Julie's call for help, the Officers had no information to arouse as much as a suspicion that the defendant was in possession of any weapons—legally or otherwise.[5] The search for the gun was at Julie's request and her testimony does not contradict this. The thrust of her testimony both here and at the preliminary hearing was that the search for the gun did not end when the gun was found and it continued to the very end of the day by which time all of the incriminating evidence had been found and inventoried. Hence, the defendant's first ground for attack is that the search as conducted which produced the evidence which later lead to the defendant's Indictment, exceeded the limited terms of Julie's request, ie., to search for a single gun. This, of course, removes completely from the case any question of coercion or waiver.[6]

The beginning of what might be termed a new era in law of third party consent searches was announced in *United States*

---

showing of the person giving the consent knowingly and intelligently waived his or her known constitutional rights. The test enunciated by the Supreme Court remains simply one of whether the consent was voluntarily given.

*v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

In *Matlock* a bank robber was arrested in front of his house. Without asking the defendant which room he occupied or whether he would consent to a search of the same, some of the officers went to the door of the house and were admitted by a woman. Without ascertaining her status other than that she jointly occupied a room in the house with the defendant, the officers obtained her consent to look for the money taken from the bank and the gun used in the robbery. Apparently, she gave permission to search the entire house. The incriminating evidence, which was the subject of the motion to suppress, was found in the bedroom which she alleged occupied jointly with the defendant. The majority opinion, concurred in by the six Justices, found little difficulty in concluding that:

> ... [T]he the prosecution seeks to justify a warrantless search by voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[7]

n. 7 Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection at his own right and that the others have assumed the risk that one of their num-

ber might permit the common area to be searched.

*United States v. Matlock, supra,* 415 U.S. at 171, 94 S.Ct. at 993.

Having decided, *supra,* that Julie's version of the events leading up to the execution of her consent of the time and manner in which the search for the contraband was executed is not credible, we turn to the principal issue in this case, of whether Julie "possessed common authority or other sufficient relationship to the premises or effects sought to be inspected."

First, we note the content of Julie's consent which is Appendix I to this Memorandum Decision. This consent coupled with the factual background constitutes a complete answer to the defendant's contention that the original search exceeded the bounds of Julie's consent. As pointed out above, the original search was not merely a consentual third party search, but a search undertaken at the request of Julie. Secondly, the thrust of the argument is that the Officers while searching for the gun found a small quantity of marijuana. This discovery, defendant argues, renders all that was seized thereafter inadmissible because Julie had not consented to a search of the premises for controlled substances. Julie's testimony concerning that episode at the preliminary examination, however, is contrary to her testimony in this proceeding.

Q Did you at any time pull out a clear plastic bag with a yellow powder in it?

A No.

Q Did you at any time point out any additional items such a a coffee can?

A No.

Q Green leafy substance of any kind?

A There was—umm, there was some marijuana on—in the spot where I said the gun would be originally, up on top of the dresser, at the very top. They found that at that point when they were looking for the gun up there. They found that. I didn't know it was up there.

Q You didn't know the marijuana—the green leafy substance was up there?

A No

Q Did you know of any contraband present in your home?

A No.[7]

Clearly, Julie's request was to find a gun, wherever it might be. It was neither circumscribed as to place, or what the searchers might seize.

As pointed out above, Officer Stanford was equivocal as to precisely what Julie told him about her access to the garage.[8]

It was never established whether or not Meyers, the person who obtained Julie's written consent, was present during this discussion or was ever informed of this conversation. Further, it was established that the garage was attached to the house forming a single structure. Based on this testimony the defendant strongly urges the Court that suppression of the contraband seized in the garage is required by *United States v. Impink*, 728 F.2d 1228 (9th Cir. 1980). *Impink* presents a substantially different set of facts. The consenting third party in *Impink* was a lessor who reserved a very limited right of re-entry, ie., to store a space heater in the garage. The garage was not attached to the house. As the lessor and her friend approached the house to seek permission to retrieve the space heater, the lessor noticed a variety of chemical laboratory equipment in the garage. When the lessor and her friend were denied permission to enter the house they reported what they had seen to the police. The police then decided to investigate, entered the curtilage and observed suspicious features of the garage, ie., large window fans and a corrosive liquid running down the window sills. They then approached the lessee of the house who insisted that the lessor had no right to look into the garage. The lessee and his co-tenant consented to a search of the house, but specifically forbade consent to enter the garage.

The Ninth Circuit Panel based its decision on its analysis of *Matlock, supra:*

The most recent Supreme Court decision on third party consent searches is *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There, the defendant was arrested in the yard of the house in which he lived and taken to a squad car some distance away. Instead of seeking the defendant's consent to a search of the house, the police asked Mrs. Graff, who shared the apartment with defendant, if they could enter, and searched the house on the basis of her consent. The court held that 'consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.' *Id.* at 170, 94 S.Ct. 992. The opinion was explicitly limited to situations where 'persons generally hav[e] joint access or control for most purposes.' *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

*Matlock* thus leaves open three possible variables in the consent calculus. First, the third party may not generally have 'joint access....for most purposes', his right of access may be narrowly prescribed. Second, the objector may not be an 'absent ... person'; he may be present at the time third party consent is obtained. Finally, the objector may not simply be 'nonconsenting'; he may actively oppose the search.

*United States v. Impink, supra,* 728 F.2d at 1232, 1233.

At the outset, it should be noted that the majority in *Matlock* specifically disclaimed reliance upon common law property refinements and doctrine but the Ninth Circuit Panel in *Impink* enlarged on such an analysis. Using the *Impink* analysis, the Court applies the three variables of the calculus to this case.

---

7. Counsel for the defendant has filed a declaration in the instant action indicating that the above quoted testimony of Julie was the first knowledge that he had of the discovery of marijuana during the search for the gun, despite an extensive interview with Julie in his office prior to the preliminary hearing. The Court is not certain as to what defense counsel contends is the legal importance of this fact, assuming it to be true.

8. Defendant does not question Julie's control over other areas of the residence.

■ (a) *Rights of Access:* Regardless of what disputes have arisen between defendant and his wife, defendant's counsel points to no facts in the record or any other authority that would suggest that the defendant could deny his wife equal access by merely forbidding or otherwise restricting his wife's access to the garage. The Court finds that her access to all parts of the residence was equal to that of the defendant.[9]

■ (b) *Absence of the Objector:* The record in this case is unclear as to when the defendant was taken from the premises. Although clearly the booking information at the jail would have been available to defendant's counsel for introduction into evidence. It was never introduced.

It seems clear from reviewing the record and drawing the inferences that one can logically draw from the testimony that Sealey was arrested shortly after 12:00 noon. Julie's consent was not obtained until sometime between 2:00 p.m. and 2:30 p.m. The witnesses who were questioned on the subject were not at all clear when the defendant was transported to the Fresno County Jail from the residence, who transported him, or any of the other myriad details that must have been contained in the appropriate Sheriff's Office records.

The Court does note, however, that the defendant was present at all phases of this hearing and was never called to the stand. Absent detailed records, the best evidence of the defendant's availability during the hours that the search was being conducted would have been the defendant himself. He chose to remain silent and not expose himself to examination. The Court, therefore, must conclude that the record on this variable is neutral.

■ (c) *Active Objection v. Mere Non-Consent.* The same observations apply to this variable as to the one immediately above. Since the presence of Sealey during the time of the search or alternately at the time consent was granted has not been established, the record is also neutral as to whether the defendant, if present, would have objected. The Court assumes that he would have objected vigorously. Logic dictates that if both parties have equal right of access and control, active objection of the other possessor the rights to access and control cannot be said to cancel the voluntary actions of the consenting party.

■ Like a search pursuant to a warrant, the purpose of a consensual search can be circumscribed by the consenting party as to the objects to be sought, as well as the area to be searched.

In *Honig v. United States*, 208 F.2d 916 (8th Cir.1953), the defendant had been convicted of impersonating a federal officer. When first contacted by the FBI the defendant informed the FBI that he was Frank Walker, the alias he had been using to impersonate an attorney for the National Labor Relations Board. When asked by the FBI if they could look around his hotel room to see if they could find any identification Honig replied: "No certainly, go ahead gentlemen".

During the course of the search the agents found three items which were the subject of his appeal; "an identification card which purported to identify himself as Frank Walker, a rubber stamp bearing the legend U.S. Bureau of Labor Relations and seven blank stock certificates." The court held that the seizure of the identification card and the rubber stamp which was used to convey the impression that it was an official government document were properly seized but the blank shares were not within the ambient of the consent given.

■ From these holdings the defendant would argue that during a search for the gun the officers were precluded from using any other material found as a basis for probable cause to seek permission, either by way of consent or by way of an authorized search warrant of other non-related

---

**9.** If, in the defendant's absence a fire broke out in the garage, Julie certainly would have the requisite authority and control to enter the garage to extinguish it, and give her consent to others to do so.

criminal activity. Defendant's counsel argues in his written papers that the proper and lawful procedure at this point would have been to cease any further search and to either attempt to procure a search warrant or ask for a specific consent to search for further drugs.[10] In *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir.1970), after the defendant's arrest and in response to a question as to whether he had any narcotics in his home, the defendant replied: "I've never seen any narcotics. You guys come over to the house and look, you are welcome to".

When later advised that he did not have to permit the search the defendant repeated: "That is all right, I told them they could search. They're not going to find any narcotics in here".

Although they found no narcotics the agents did find and seize personal papers that later became the basis for the defendant's conviction of two counts of willfull income tax evasion. The panel for the Seventh Circuit reversed the defendant's conviction holding that the consent limited the permissible search to a search for narcotics and not a general search for evidence of other criminal activity, stating:

> Our holding that the search was unreasonable because it went beyond the scope of defendant's consent would be the same if the agents had conducted the search under a search warrant which authorized the seizure of narcotics. Such a warrant would not have given the agents the power to read defendant's personal papers.

*United States v. Dichiarinte, supra*, 445 F.2d at 130

The troubling issue in this case is that while it is clear to the Court that no limits were placed on the *areas* of search, likewise there were no limits placed upon the *objects* of the search. Indeed, there was no discussion with Julie on the subject. At the time consent was given, the police had information from which they might conclude that the Sealey residence probably contained evidence of violations of the tax laws, gun registation and possession laws, and controlled substance laws.

The Court has found no authority, and counsel has furnished none, which holds that a consensual search, unlike a warrant search is valid, if it does not contain within the terms, a limitation on the objects to be sought or seized. Counsel for the Government articulated this position at oral argument, but has come forward with no supporting authority.

Throwing caution to the winds, the Court relies on logic: the search in this case could be as broad as the Officer's previously acquired knowledge: ie., objects bearing on the violations of the tax laws, gun control laws and law regulating controlled substances.

## THE SEIZURE OF THE MACHINE GUN

 As related above, Tax Compliance Representative, Van Norwitch of the Franchise Tax Board, California Franchise Tax Board issued a seizure warrant in support of a jeopardy tax assessment which she made at the scene.[11]

During the inventory of one of the vehicles, a weapon capable of firing automatically was found and seized.

The testimony as to whether Julie consented to the search of the vehicles is not conclusive. In *Bomher v. Reagan*, 522 F.2d 1201, 1202 (9th Cir.1975) the court stated:

> Summary tax collection procedures, which provide for subsequent judicial review, have been sustained against consti-

---

**10.** This argument contains a logical fallacy: If the discovery of the marijuana violated defendant's Fourth Amendment right because it exceeded the bounds of Julie's consent or alternately it was not in plain sight (which the Court concedes that it was not) logic compels that the conclusion that the marijuana could not form

the basis for any further law enforcement activity, whether it be an application for search warrants, or the basis of an exigient circumstances search, or a search pursuant to a valid arrest.

**11.** Apparently this assessment was never challenged in state court.

tutional challenge since the case of *Phillips v. Commissioner*, (1931) 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed 1289. The Court there held that such procedures neither deprived a taxpayer of due process nor amounted to an unconstitutional delegation of judicial authority to the executive branch of government. *Id.*, at 593–594, 597–598, 51 S.Ct. 608. The exception in tax matters to prior notice and hearing was more recently reaffirmed in *Fuentes v. Shevin*, (1972), 407 U.S. 67 90–92, 92 S.Ct. 1983 [1999–2000], 32 L.Ed.2d 556, *reh. den.* 409 U.S. 902 [93 S.Ct. 180, 34 L.Ed.2d 165]. *See Tavares v. United States*, (9th Cir.1974) 491 F.2d 725, 726. The fact that a taxpayer disputes the tax debt, as appellant asserts he does here, does not alter the rule of *Phillips*. *See Kalb v. United States*, (2nd Cir.1974) 505 F.2d 506, 510.

California revenue and tax law provides for subsequent judicial review in personal income tax matters by way of a suit in state court for a refund. California Revenue and Tax Code § 19081 *et seq.* A similar procedure was expressly held adequate as an alternative means of subsequent judicial review in *Phillips*, 283 U.S. at 597–598, 51 S.Ct. 608 [at 611–612]. Thus, appellant has not shown a constitutional deprivation based on the seizure and sale of his automobile. Since no constitutional deprivation could be found from the summary tax collection activities of appellees, there could be no actionable conspiracy. The district court committed no error in dismissing appellant's complaint brought under 42 U.S.C. §§ 1983, 1985(3) and 1986 for failure to state a claim. When a case is dismissed for failure to state a claim for relief, a pure question of law, no question of fact exists for a jury to try.

Clearly, if the vehicle was legally seized, the inventory of the vehicle was lawful. In *United States v. Mitchell*, 458 F.2d 960 (9th Cir.1972) the court upheld a seizure of items in plain view of the officer inventorying the contents of an impounded vehicle. This evidence became the foundation of a gun violation conviction, which the Ninth Circuit Panel upheld.

In *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) the Court upheld the seizure of narcotics from the glove compartment of an automobile that had been impounded pursuant to California forfeiture statutes. The Court stated, 386 U.S. at 61–62, 87 S.Ct. at 791, 17 L.Ed.2d at 733:

> They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car—whether the State had "legal title" to it or not—was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection to search it.

Since the original seizure here was legal, as was the case in *Mitchell* and *Cooper*, *supra*, the inventory search was legally permissible.

For all of the foregoing reasons, the defendant's Motion to Suppress is denied.

APPENDIX I

I, JULIE ELLEN SEALEY, AM LEGALLY MARRIED TO LOREN ADRIAN SEALEY, DOB OF 12-18-46 AND AT PRESENT AM LIVING AT 2127 N. GREENWOOD, CANYON FRESNO, CALIF.

I, AFFIRM THAT I RECEIVE MAIL AT THIS ADDRESS AND HAVE 2127 N. GREENWOOD AS MY LEGAL ADDRESS.

ALSO, I AM LEGALLY PART OWNER/PURCHASER OF 2127 N. GREENWOOD BY 50% INTEREST. I HAVE FULL ACCESS TO THE RESIDENCE OF 2127 N. GREENWOOD AND ANY OUTBUILDINGS, GARAGES, ETC. ON THE PROPERTY'S TWO AND ONE-HALF ACRES (2½).

I, JULIE ELLEN SEALEY, DO HEREBY GIVE FRESNO SHERIFF'S DEPARTMENT DEPUTIES & DETECTIVES THE PERMISSION TO SEARCH ANY AND/OR ALL PARTS OF MY RESIDENCE AND OUTBUILDINGS AND GROUNDS.

I, JULIE ELLEN SEALEY GIVE THIS PERMISSION WILLINGLY, FREELY AND WITHOUT THREAT OR DURESS BY FRESNO SHERIFF'S DEPT PERSONNELL.

x _Julie Sealey_ 6-19-85

PRINT NAME _Julie Sealey_

WIT _____ - L.R. MEYERS

_____ M. STANFORD "A"

Exhibit--A

## APPENDIX II
### FRESNO COUNTY SHERIFF'S DEPARTMENT
#### EVIDENCE LIST
#### SPECIAL INVESTIGATIONS DETAIL

CASE NO. 85-11880

SID NO. _____

DATE 6/19/85 SUSPECTS: SEALY, LOREN A.

Pg 1

| ITEM NO. | DESCRIPTION | LOCATION | BY DET. |
|---|---|---|---|
| 1 | ~~XXXX~~ $56,000 IN CASH | BAG IN S/E BEDROOM | G. HEALEY |
| 2 | SMALL CASE C/ PLASTIC BAGS, ONE C/ WHITE POWDER, ONE C/ PLANT MATERIAL | TOP OF DRESSER S/E BEDROOM | G. HEALEY |
| | SMALL BOTTLE C/ WHITE POWDER RESIDUE | DRESSER S/E BEDROOM | M.S. |
| | PLASTIC BUCKET C/ 8 CLEAR PLASTIC BAGS, EACH C/ A WHITE POWDER | SHELF ON E/WALL OF GARAGE, 3RD SHELF | G. HEALEY |
| 5 | PLASTIC BUCKET C/ 6 PLASTIC BAGS, EACH C/ A WHITE POWDER | SHELF ON E/WALL OF GARAGE, 2ND SHELF | G. HEALEY |
| 6 | BOX C/ FOUR PIECES of PLASTIC TUBES, ONE TUBE FOUND TO C/ A WHITE POWDER | SHELF ON E/WALL OF GARAGE, 1ST SHELF | M.S. |
| 7 | BRN. PAPER SACK C/ TWO CLEAR PLASTIC BAGS, E C/ GREEN PLANT MATERIAL. | SHELF ON E/WALL OF GARAGE, 2ND SHELF | G. HEALY |

REPORTING OFFICER: M. STANFORD DATE: 6/19/85

-Exhibit "B"

814

**FRESNO COUNTY SHERIFF'S DEPARTMENT**

EVIDENCE LIST

SPECIAL INVESTIGATIONS DETAIL

CASE NO. 85-11880

SID NO. _____

DATE 6/19/85 SUSPECTS: SEALY, LOREN A

_____ PS2

| O. | DESCRIPTION | LOCATION | BY DET. |
|---|---|---|---|
| | LARGE PLASTIC TRASH BAG c̄ GREEN PLANT MATERIAL | SHELF ON E/WALL OF GARAGE, 2ND SHELF | G. HEALY |
| | BROWN PAPER SACK c̄ CLEAR PLASTIC BAG c̄ GREEN PLANT MATERIAL | SAME AS 8 | G. HEALY |
| | PLASTIC BUCKET c̄ WHITE POWDER | UNDER SHELF, E/WALL OF GARAGE, ON FLOOR | M.S. |
| | WHITE PLASTIC TUBE c̄ FIVE INDIVIDUALLY WRAPPED PLASTIC BAGS, EACH c̄ A WHITE POWDER | SHELF ALONG E/WALL OF GARAGE, TOP SHELF | M.S. |
| | WHITE PLASTIC TUBE c̄ FIVE INDIVIDUALLY WRAPPED PLASTIC BAGS, EACH c̄ A WHITE POWDER | SHELF ALONG E/WALL OF GARAGE, TOP SHELF | M.S. |
| | EMPTY PLASTIC TUBE | SHELF ALONG E/WALL OF GARAGE, 3RD SHELF | M.S. |
| | EMPTY PLASTIC TUBE | FLOOR, UNDER SHELF ALONG E/WALL OF GARAGE | |
| | EMPTY PLASTIC TUBE | SHELF ALONG E/WALL OF GARAGE, 3RD SHELF | |

REPORTING OFFICER: M. STANFORD DATE: 6-19-85

**FRESNO COUNTY SHERIFF'S DEPARTMENT**

**EVIDENCE LIST**

**SPECIAL INVESTIGATIONS DETAIL**

CASE NO. 85-11880

SID NO. _____

DATE 6/19/85 ___ SUSPECTS: SEALY, LOREN A.

P 3

| TEM NO. | DESCRIPTION | LOCATION | BY DET. |
|---|---|---|---|
| 6 | BOX ̄c 11 CLEAR PLASTIC BAGS, EACH ̄c A WHITE POWDER | ATTACK OF S/E BEDROOM | V.J. |
| 7 | BOX ̄c 13 CLEAR PLASTIC BAGS, EACH ̄c A WHITE POWDER | ATTACK OF S/E BEDROOM | V.J. |
| 8 | BOX ̄c 31 CLEAR PLASTIC BAGS, EACH ̄c A WHITE POWDER | ATTACK OF S/E BEDROOM | V.J. |
| 19 | CHEMICAL LIST | TOP OF DRESSER S/E BEDROOM | V.J. |
| 20 | 9 MONEY ORDER RECIEPTS. | SAME AS 19 | V.J. |
| 21 | MISC. ENVELOPES, PAPERS AND WRITEN DOCUMENTS. | SAME AS 19 | V.J. |
| 2 | PINK SLIP FOR CHEYENNE BOAT | SAME AS 19 | V.J. |
| 3 | GOLD PIECE | SAME AS 19 | V.J. |
| 4 | MISC. PHOTOS + FOUR PHOTO ALBUMS | S/W BEDROOM | G.M. |
| 5 | MISC. FIANCIAL RECORDS | S/W BEDROOM | G.M. |

REPORTING OFFICER: M. STANFORD ___ DATE: 6-19-85

816

FRESNO COUNTY SHERIFF'S DEPARTMENT

EVIDENCE LIST

SPECIAL INVESTIGATIONS DETAIL

CASE NO. 85-11880

SID NO. _____

DATE 6-19-85 SUSPECTS: SEALY, LOREN A

P34

| ITEM NO. | DESCRIPTION | LOCATION | BY DET. |
|---|---|---|---|
| 26 ✓ | "PEPSI" CAN | 2ND SHELF OF SOUTH KITCHEN CABINET | M.S. |
| 27 / | TRAY C̄ GREEN PLANT MATERIAL, PLASTIC BAG C̄ GREEN PLANT MATERIAL, CIGARETTE PAPERS, COFFEE CAN C̄ 2 PLASTIC BAGS C̄ GREEN PLANT MATERIAL, BURNT CIGARETTE ENDS | TOP OF HUTCH, DINNING AREA. | G. HEALY |
| 28 ✓ | "OHAUS" TRIPLE BEAM SCALE | CLOSET OFF OF LAUNDRY ROOM | G.M. |
| 29 ✓ | "NUTRISCALE", ELECTRONIC SCALE | SAME AS 28 | M.S. |
| 30 ✓ | PHONE BILLS | FILE BOX IN DEN | A.C. |
| 31 ✓ | BAIL RECEIPT | FILE BOX IN DEN | E.B. |
| 32 ✓ | ENVELOPE W/PHONE NUMBERS | TABLE ON S/WALL OF DEN | R.B. |
| 33 ✓ | BOX C̄ 15 INDIVIDUALLY WRAPPED PLASTIC BAGS EACH C̄ A WHITE POWDER | 1ST SHELF ALONG E/ WALL OF GARAGE | G.M. |
| 34 ✓ | MISC. PAPER WORK + TAPE | TOP OF DRESSER S/E BEDROOM | A.C. |

REPORTING OFFICER: M. Stanford DATE: 6-19-85

SO-185

FRESNO COUNTY SHERIFF'S DEPARTMENT

EVIDENCE LIST

SPECIAL INVESTIGATIONS DETAIL

CASE NO. 85-71880

SID NO. _____

DATE 6/19/85 SUSPECTS: SEALY, LOREN A

_____

P35

| ITEM NO. | DESCRIPTION | LOCATION | BY DET. |
|---|---|---|---|
| 35 ✓ | UNK. TYPE FIREARM | FRONT TRUNK "BERTONE" VEH., IN FRONT YARD | G. TAGLIMONTI |
| 36 ✓ | PHONE BOOK, VEH. REG. FOR 58 FORD. | PLASTIC BUCKET, BACKYARD ALONG FENCE LINE | J. Hollis |
| 37 | PLASTIC BAG ⊂ GREEN PLANT MATERIAL | MANS LEATHER JACKET 2/POCKET, HALL CLOSET | A.K. |
| 38 | WESTERN UNION MONEY RECEIPT—TWO RECEIPTS FROM "WECO" | KITCHEN COUNTER | A.K. |
| 39 | MISC. PAPER WORK | KITCHEN TABLE | A.K. |
| 40 | BANK RECORDS | GIVEN TO A. KROMBERG | A.K. |

REPORTING OFFICER: M. Stanford DATE: 6/19/85

SO-186

EXHIBIT C

June 19, 1985, approx 1230 hrs. Wednesday, At the above date and time, Sgt. Hollis detailed Det. Stanford to 2127 N. Greenwood, to assist Patrol Deputies with possible narcotics at the residence.

Upon arrival at approx. 1250 hrs. Det. Stanford was contacted by Sgt. Tafoya.

Sgt. Tafoya advised Det. Stanford that Loren SEALY had been placed under citizens arrest by his wife July Sealy for battery. Sgt. Tafoya advised Det. Stanford that during the course of Deputy Healy's investigation, a small amount of what appeared to him to be Methamphetamine, and a large amount of cash had been located. Sgt. Tafoya further advised Det. Stanford that

Julie Sealy had given consent for law enforcement officers to search the residence. Sgt. Tafoya advised Det. Stanford that Loren SEALY had already been removed from the residence, as per the citizen's arrest for P.C. 242.

Det. Stanford contacted Julie SEALY in the den area of the residence. Det. Stanford was identified to Julie SEALY by Dep. G. Healy as being a narcotics detective for the Fresno County Sheriff's Department.

Deputy Healy showed Det. Stanford a beige travel bag which contained numerous white paper envelopes. Julie SEALY advised Det. Stanford that each envelope contained one thousand dollars ($1,000.00) in cash. Dep. Healy then showed Det. Stanford a brown case. The case contained two (2) clear plastic bags, one bag contained a white powder, and the other contained a green plant material. Det. Stanford observed that the two (2) substances appeared to be Methamphetamine and Marijuana.

Det. Stanford interviewed Julie SEALY regarding her consent to search the residence. Julie SEALY advised Det. Stanford that she had access to all portions of the residence and property. Julie SEALY stated that she and her husband had not been sleeping in the same room due to marital problems. Julie SEALY further advised that she still had access to the master bedroom anytime she wanted and that "I would still be sleeping in here if Loren had his way." Det. Stanford observed female clothing in both dressers of the master bedroom, and the closet of the master bedroom.

Det. Stanford asked Julie SEALY if she believed there to be any narcotics in the residence. Julie SEALY stated "I don't know, I don't know about the garage, he doesn't let me go in there unless he is around, and then it's to get him a tool."

Det. Stanford then asked Julie SEALY if there was any portion of the residence or property that she would like to deny officers access to, to search. Julie SEALY replied, "No." Det. Stanford advised Julie SEALY that she could refuse officers the right to search, to which she replied, "I know."

Det. Stanford telephoned Sgt. Hollis and advised him of the initial findings and of the consent to search. Sgt. Hollis advised that Det. Meyers would be enroute to assist.

At approx. 1330 hrs. Det. Meyers arrived, and was briefed on the current situation by Det. Stanford. Det. Meyers again went over the consent to search with Julie Sealy. A written consent was prepared by Det. Meyers. Julie Sealy read and signed the letter of consent. Detectives Stanford and Meyers both signed the note as witnesses. Det. Meyers also advised Julie SEALY of her right to refuse the search of the residence.

Det. Stanford brought the beige travel bag out into the den area. Det. Stanford removed the bag's contents onto the pool table, and observed thirty six (36) white paper envelopes. Det. Stanford found there to be one single enevelope, and five (5) bundles. Each bundle contained five (5) envelopes. Each of the bundles was held together with rubber bands.

Det. Stanford found each envelope to contain one thousand dollars ($1000.00), ranging in denominations of twenties, fifties, and one hundred dollar bills. Det. Stanford counted a total of $36,000.00. Det. Stanford replaced the money into each envelope, and reformed each bundle. Each envelope was numbered and initialed by both Detectives Stanford and Meyers.

The search of the residence began. Dep. Healy who had been searching the garage contacted Det. Stanford and advised that he located what appeared to be packaged narcotics in the garage. Det. Stanford went to the garage where Dep. Healy pointed out a large plastic bucket, located on the third shelf along the east wall. Det. Stanford removed the lid of the bucket and observed eight (8) clear plastic bags, each contained a white powder and each

wrapped with silver tape. Det. Stanford also detected a strong chemical odor about the container. Dep. Healy further located an additional plastic bucket on the second shelf along the east wall of the garage. Det. Stanford removed the lid of the bucket and observed it to contain six (6) plastic bags, each contained a white powder. This item was later marked item # 5. At this point Det. Stanford instructed Dep. Healy to remain in the garage, but not to search any further. The above described item was later marked as # 4. Det. Stanford located the following items in the garage; a cardboard box containing four (4) pieces of plastic tube. Each tube was found to be sealed at both ends. The tubes were sealed by gluing on plastic caps. Det. Stanford cut open one of the tubes and found it to contain a plastic bag, which contained a white powder. The remaining three tubes were not opened. This item was marked item # 6. A plastic bucket containing white powder, located on the floor under the third shelf on the east wall. This item was later marked as item # 10. Two (2) long pieces of plastic tubing were located on the first shelf along the east wall of the garage. Both tubes were sealed with caps glued on at each end. Det. Stanford cut open the two (2) tubes. Each tube was found to contain five (5) individually wrapped plastic bags. Each plastic bag contained a white powder. Det. Stanford re-sealed both tubes. Det. Stanford then marked the tubes items # 11 and # 12.

Three (3) empty pieces of plastic pipe were also located in the garage by Det. Stanford. The items were marked # 13, # 14, and # 15. Item # 13 was located on the third shelf above the east wall of the garage. Items # 14 and # 15 were located on the floor, under the third shelf along the east wall of the garage.

Det. Jura located items # 16, # 17, # 18 in the attic of the S/E bedroom. Item # 16 was found to be a cardboard box containing eleven (11) clear plastic bags each containing a white powder. Item # 17 was found to be a cardboard box containing thirteen (13) clear plastic bags, each containing a white powder. Item # 18 was found to be a cardboard box containing thirty one (31) clear plastic bags, each containing a white powder.

Dep. McClung located item # 33 on the first shelf along the east wall of the garage. Item # 33 was found to be a cardboard box containing fifteen (15) clear plastic bags, each containing a white powder.

Dep. G. Taglimonte located item # 34, which is an unknown make machine gun. This item was located in the front trunk portion of the "Bertone" vehicle which was parked in front of the residence.

For a specific list of all other items, and the location at which they were seized, see attached evidence list.

All items were photographed and then seized by Det. Stanford. All items were placed into evidence at the Fresno Sheriff's Department by Det. Stanford.

On 6–20–85 at approx. 1000 hrs. Det. Stanford along with ATF Agent Jeff Roehm fired the seized weapon, item # 35, at the FSD firing range. Agent Roehm found the weapon to be fully automatic.

On 6–20–85 at approx. 1600 hrs. Det. Stanford transported items # 4, # 5, # 6, # 11, # 12, # 16, # 17, # 18, and # 33 to the Department of Justice Lab in Fresno. All other items were turned over to DEA Agent A. Kromberg on 6–24–85 at approx. 1030 hrs.

M. Stanford
Detective M. Stanford/SID