**UNITED STATES of America**

v.

**Israel KATZ, Defendant.**

United States District Court
S. D. New York.
Feb. 18, 1965.

William Esbitt and Marvin B. Segal, New York City, for defendant.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, by Edward M. Shaw, Asst. U. S. Atty., for the prosecution.

TYLER, District Judge.

Israel Katz, also known as Jack Katz, has moved for an order pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure directing suppression and return of certain evidence consisting of 1,050 unsymboled Swiss watch movements and an automobile seized by United States customs agents on August 5, 1963.

Subsequent to his arraignment before a United States commissioner in the Eastern District of New York on August 6, 1963, Katz was named as one of sixteen defendants in an indictment charging substantive and conspiracy violations of the provisions of 18 U.S.C. § 545. Katz was charged in only one count of the original indictment—the conspiracy count—alleging that he and the other defendants conspired to smuggle unsymboled watch movements into the United States and to receive, sell and facilitate the transportation of such watch movements, knowing the same to have been illegally brought into this country.

Defendant claims that he was searched without a warrant and contrary to law at about 4:30 p.m. on August 5, 1963 on Lanett Avenue, Far Rockaway, Queens and that about 1,050 Swiss watch movements plus his personal automobile were thereafter illegally seized from him.[1]

The government resists his motion to suppress upon a number of theories which may be fairly summarized as follows:

(1) The seized items were the fruits of a search incidental to a lawful arrest and thus were obtained in a constitutionally permissible fashion.

(2) There was a valid search and seizure pursuant to the special powers con-

1. As a practical matter, the main issues center upon the watch movements; however, the controversy concerning the au-

tomobile will be separately treated at the conclusion of this opinion.

ferred upon customs agents by the provisions of 19 U.S.C. § 482.

(3) The search and seizure were justified by the special facts and circumstances giving rise to proper application of what is sometimes styled as the "emergency mobility situation" doctrine. See Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) and cases therein cited.

(4) The moving defendant clearly consented to the search and seizure in question.

The motion came on for hearing before this court on December 10, 16, 17 and 23, 1964. Upon the basis of the testimony and other evidence adduced on those hearing days, the following facts are found:

During the summer of 1963 the Bureau of Customs, United States Treasury Department, Region I (covering the northeast United States) was conducting an investigation regarding watch movements which had been illegally brought into this country. Customs agent John Dolan of the New York City office was placed in charge of that investigation, and Region I supervising customs agent Mario Cozzi from time to time assisted Dolan. Early in this investigation, there were indications that Valiant Watch Company, a New York City firm, might be involved in the illegal traffic of watch movements. Because of their connection with the Valiant Watch Company, various members of a family named Katz became principal subjects of the investigation, especially the brothers Maurice, Joseph, Ludvik and Zoltan ("Sonny") Katz.

By August 2, 1963, Dolan and Cozzi had amassed sufficient information to obtain warrants to arrest various persons at the Valiant Watch Company and to search the Valiant premises.[2] As an additional safeguard, Cozzi and Dolan decided that a surveillance of the homes of those who were to be arrested would be made on the day of the arrest. The date for the raid was set for August 5, 1963.

On the morning of August 5, Cozzi briefed several customs agents, including port investigators McMeekin and Bailey. Cozzi sketched the history and background of the investigation and told them, among other things, that Maurice Katz and others were to be arrested later in the day. McMeekin and Bailey were then directed to proceed after lunch time to the vicinity of the home of Maurice Katz located at No. 907 Lanett Avenue, Far Rockaway, and place this house under surveillance. McMeekin and Bailey were especially exhorted to be on the alert for persons carrying small, heavy looking packages wrapped in brown paper to or from the Maurice Katz premises. Shortly after noon, McMeekin and Bailey arrived at Lenett Avenue. After discreetly parking their car five houses down from number 907 but on the same side of the street, they took up their vigil from the front seat of the auto.

In the meantime, back in Manhattan Dolan had led other customs agents into the Valiant offices at about noontime; arrests and searches were there made pursuant to the previously issued warrants. It was at this stage that Jack Katz, the moving defendant, made his first appearance. Dolan found Jack in the Valiant offices. He told Dolan, in response to the latter's questions, his name and that, as Dolan already realized, he was another brother of Maurice Katz. Dolan then said he was free to leave, at which point Jack Katz said that he would be returning to his office.[3]

Picking up the tale in Far Rockaway again, agents McMeekin and Bailey observed nothing unusual until after 4:00 p. m. when a light colored auto slowly drove down Lanett Avenue, circled the

2. Among other things, the agents by this time were relying upon information covertly supplied by a shipping clerk employed by Valiant at its New York headquarters.

3. Dolan and Cozzi had been aware for months that Jack Katz, though occasionally doing various business errands for Valiant, had real estate and construction business interests in the City or its environs.

block twice and finally parked about three doors away from the Maurice Katz home on the same side of the street and between that house and the agents' car. Instead of getting out at once, the driver of this auto remained seated for at least one minute; finally, he left the car and went to the entrance of Maurice Katz' house. After a few moments, he reappeared and walked down the driveway between Maurice Katz' house and the one next to it until he again was out of sight.

McMeekin promptly called his New York office by the radio phone in his car and reported what he and Bailey had just observed, including the license plate number of the light colored auto. The base set operator at once reported back that the car in question belonged to Jack Katz who had been questioned earlier at the scene of the arrests at Valiant Watch Company, that Bailey and McMeekin should observe Katz carefully and that, in particular, they were to intercept and question him in the event he were to appear with the aforementioned type of small, heavy, brown-wrapped package or packages. The operator also reminded McMeekin that there was no outstanding warrant for Jack Katz' arrest.

Ten minutes later Jack Katz emerged from the same driveway he had previously entered. He was carrying two packages, one under each arm, wrapped in brown paper and appearing to be heavy. McMeekin again called the Customs base set in Manhattan, and again he was told to stop and question Jack Katz.

In this interval, Katz had turned onto the sidewalk and walked toward his car. As he did so, the two agents drove their car forward and pulled up alongside of Katz' auto. Observing this maneuver, Katz did not stop or get into his car but kept walking along the sidewalk past his parked vehicle and the agents, who were stepping out of their car. McMeekin called to Jack Katz, approached him on the sidewalk, showed his credentials and advised that he and Bailey were conducting an investigation.

McMeekin then invited Katz to step into the government car for a talk. Jack Katz accepted this suggestion without hesitation, saying that he was an American citizen and had nothing to hide. Upon getting into the government car, Katz also stated that he was merely picking up some packages for his brother. McMeekin replied that he would appreciate Katz' cooperation and that he was not placing Katz under arrest. The three men drove to another location off Lanett Avenue in order to avoid the gaze of some neighbors whose curiosity had been aroused by the foregoing events. Agent Bailey was driving, McMeekin was in the right front seat and Katz was in the back seat with the two packages.

McMeekin then asked Katz if he would mind showing him the packages. Katz said he would not mind and handed one of the packages to McMeekin. McMeekin refused, saying that he would prefer to have Katz open the package himself. Katz thereupon opened one of the packages, reached in, removed a small box from within and handed it to McMeekin. McMeekin then opened the small box and found watch movements. The other boxes from both packages were then opened and the contents counted and placed on the front seat.

Bailey then drove to a nearby gas station where McMeekin placed a telephone call to the New York office out of the hearing of Katz. McMeekin was told by his headquarters to ascertain if Katz would voluntarily reveal the place where he had picked up the two packages. Upon rejoining Bailey and Katz, McMeekin was told by Katz that he would be glad to lead the agents to the place where he had picked up the packages. Thereupon the three men drove back to Lanett Avenue where Katz took McMeekin to the basement of a house behind Maurice Katz' house. This particular house, incidentally, was that of Sonny Katz. Neither McMeekin nor Jack Katz could find any more watch movements in this cellar area.

Katz and McMeekin then rejoined agent Bailey in the government car.

Bailey drove to a neighboring luncheonette where McMeekin made another telephone call to headquarters. McMeekin was instructed to see if Katz would be willing to come to the headquarters at 201 Varick Street in Manhattan to undergo further questioning. When he was asked by McMeekin about this, except for voicing some concern about leaving his own auto, Katz expressed acquiescence. Before leaving for Manhattan, the three men returned in the government car to Lanett Avenue to pick up Katz' auto. At this point, McMeekin inquired if he could look in the trunk of the latter vehicle. Katz responded by opening his trunk. No incriminating materials were there to be found.

It was thereupon decided that Katz would drive to Manhattan in his own car accompanied by McMeekin and that Bailey would follow them in the government car.

About 6:00 p. m., the two autos pulled up and parked near 201 Varick Street. Katz was taken to the fourth floor of the building where he was questioned by various Customs agents. At approximately 7:00 p. m. Mr. Katz was formally placed under arrest by agent Dolan and removed shortly thereafter to the West Street detention facility. The following day he was taken to the federal building in Brooklyn and arraigned before a commissioner at about 1:00 p. m.

It is to be noted that Katz' auto and the two packages of watch movements were formally seized at the time or shortly before he was told by agent Dolan that he was being placed under arrest.

Defendant's counsel in their several able briefs have consistently urged that, contrary to the government's position on this point, no lawful arrest took place on Lanett Avenue between 4:30 p. m. and 5:00 p. m. on August 5th during the moments just after the government car

pulled alongside Jack Katz' car and when agent McMeekin first accosted defendant on the sidewalk. In a sense, I agree with this position; more precisely, however, I take the view that Jack Katz was neither formally nor informally placed in a state of arrest on or near Lanett Avenue in Far Rockaway that afternoon of August 5. It might be tempting to accept, as the government presses me to, the more usual and convenient rubric of a search incidental to a lawful arrest. But to succumb to such temptation would be to draw unwarranted inferences from the facts that: (1) McMeekin categorically informed Katz that he was not under arrest[4]; (2) Katz did not believe he was under arrest, largely but not entirely because of McMeekin's disclaimer[5]; (3) after Katz first was detained, McMeekin made a number of calls to his headquarters for instructions; and (4) the resultant instructions were consistently to the effect that Katz' voluntary cooperation should be enlisted if possible.

Parenthetically, however, fair mention should be made of one of defendant's arguments built upon the undeniable fact that both McMeekin and Bailey testified in substance that if Jack Katz had attempted to remove himself from their company after he was initially detained, they would have endeavored to restrain him (Eg. SM 57, 58, 68, 69, 274, 275). Assuming that defendant relies, as I understand him to, upon this testimony to show some sort of illegal arrest or detention status as opposed to voluntary consent, I cannot agree with him for two reasons. First, there is no evidence of any kind that Katz either considered or attempted removing himself from the agents' presence. Second, both the demeanor of the witnesses as they answered questions on this subject and the circumstances at the hearing as such testimony came out strongly suggest that this was

4. "I said, 'You understand you are not under arrest. We would like your cooperation in an investigation relative to watch movements.'" (Testimony of McMeekin, SM 36.)

5. Later at 201 Varick Street and just after agent Dolan had told him that he was being placed under arrest, Jack Katz came up to McMeekin and said, "I thought you told me I wasn't (under) arrest." (SM 93.)

"hindsight reconstruction", honestly intended, no doubt, but nevertheless unwittingly designed to conform to the witness' self-esteem as conscientious law enforcement officers and, perhaps, to bolster government counsel's major thesis that Jack Katz was under arrest upon probable cause.

Returning to the main theme, the determination that no arrest took place on Lanett Avenue does not necessarily require that the fruits of the "search" there taking place must be suppressed. As Judge Kaufman has pointed out under somewhat similar circumstances, "[T]he problem *. * * is not whether the challenged police procedures constituted an 'arrest', but whether these procedures were of such a character that all evidence stemming from them must be suppressed." United States v. Bonanno, 180 F.Supp. 71, at page 78 (S.D. N.Y.1960), reversed on other grounds sub nom. United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960).

█ In this light, I conclude that, independent from any arrest, agents McMeekin and Bailey had sufficient and proper reasons to stop and question Jack Katz as they did on Lanett Avenue sometime between 4:30 p. m. and 5:00 p. m. on August 5. See United States v. Bonanno, supra, 180 F.Supp. at pages 77 et seq.; United States v. Vita, 294 F.2d 524, at page 530 (2d Cir. 1961); see discussion in Ronayne, The Right to Investigate, and New York's 'Stop and Frisk' Law, 23 Fordham Law Review, 211, 222–226 (1964). To begin with, there was the information imparted to the agents by Cozzi early that morning regarding the forthcoming arrest at the premises of Valiant Watch Company and the rather precise description of the paper-bound packages which were to be looked for out on Lanett Avenue in and near the premises of Maurice Katz. Then, too, there were the suspicious maneuverings of the Jack Katz automobile when it came into the view of the two agents seated in the government car and slowly circled the block at least once before parking, not in front of the house of Maurice Katz but two or three doors away, coupled with the circumstance that Katz remained seated at least a minute before getting out of the car. There is also the circumstance that McMeekin and Bailey were able by radio to ascertain that the license registration was that of Jack Katz, the brother of Maurice Katz and that Jack had been on the premises when the earlier arrests that day had been made at Valiant Watch Company. Finally, there was the rather obvious but peculiar phenomenon of Jack Katz walking along the sidewalk and, upon becoming aware that a car was pulling up alongside his own, of continuing on beyond his car as if to walk down the street. Thus it is that I view the matter that the two agents were justified in stopping and questioning Jack Katz.[6]

█ Further, I find that, during this brief period of lawful detention by the agents, Jack Katz as a practical and legal matter knowingly and willingly consented to the "search" that thereupon followed. This is so, not entirely because of what happened just prior to the opening of the packages in the government car, but also upon a realistic appraisal of the events of the entire day, particularly insofar as Jack Katz participated in them.

██ It is recognized that, of course, consent to a search is not to be lightly inferred. United States v. Viale, 312 F. 2d 595, at pg. 601 (2d Cir. 1963); United States v. Como, 340 F.2d 891 (2d Cir. decided January 26, 1965). Necessarily, a defendant's voluntary consent must be proven by clear and positive proof. It cannot be the product or result of duress or coercion, direct or indirect. To be voluntary, consent must be shown to have been unequivocally, specifically and in-

---

6. Indeed, these circumstances may have been enough to establish "probable cause" for arrest of the defendant, but as already indicated, no arrest was then intended or effectuated on Lanett Avenue.

telligently made under all the surrounding circumstances. United States v. Smith, 308 F.2d 657, at pg. 663 (2d Cir. 1962), cert. denied 372 U.S. 906, 83 S. Ct. 717, 9 L.Ed.2d 716 (1963).

Not only what happened in the government automobile but also what transpired before and after in the vicinity of Lanett Avenue and, indeed, at Valiant Watch Company was enough to comport with the exacting standards required by the courts for consent to search. It is true that Jack Katz did not take the stand, yet I believe it fair to observe from such evidence as there is in the record plus his own appearance as he sat at the hearings on this matter that Katz is a business man in the prime of life with considerable experience in worldly matters. Thus it was that he, very soon after being accosted by McMeekin, said in substance that the packages belonged not to him but to his brother.[7] In addition, some time after the inspection of the contents of the packages in the automobile, Katz freely and almost eagerly agreed to open up the trunk of his car for inspection by the agents and, before that event, to lead the agents to the place in Sonny Katz' house from whence he had obtained the two packages which are the principal subjects of this motion.

It cannot be gainsaid that people detained by police often assume it advantageous to be completely cooperative, usually, no doubt, with the hope that such conduct in the long run will be the best route out of their predicament. See United States v. Burgos, 269 F.2d 763 (2d Cir. 1959). Moreover, earlier in the day of August 5th, Jack Katz had had the benefit of the experience of being temporarily detained by federal officers, allowed to explain his presence and then released. I think it not unreasonable, therefore, to deduce that he hoped that the same fortunate results would be forthcoming by an attitude of complete cooperation on Lanett Avenue late in the afternoon. In any event, Katz' actions and attitudes that late afternoon of August 5, 1963 were totally consistent with consent, freely and intelligently given for whatever motives, and the extreme caution and courtesy of the agents in their dealings with Katz only serve to buttress this conclusion.

■ Implicit in this view of the matter, of course, is the determination that the government's other arguments of a search supported by a lawful arrest on Lanett Avenue or by the peculiar provisions of the "custom agents' statute" (19 U.S.C. § 482) or by the "fleeing automobile" or "emergency mobility situation" doctrine either are inapposite or need not be reached. The motion to suppress evidentiary use and for return of the watch movements is denied.

■ There remains for consideration the Katz automobile. Neither party has extensively argued or briefed its specific position with regard to the car, and, confessedly, I find the few reported cases under the allegedly applicable statute (19 U.S.C. § 1595(a)) to be largely unilluminating, at least in regard to the facts of record here.

A perusal of Customs Form 5955 ("Report of Seizure") prepared on August 12, 1963 indicates the government's statement of the circumstances of seizure of the 1960 Chevrolet to have been, "Vehicle seized was used in furtherance of watch smuggling operations". Suffice it to say here without elaborate discussion that on the facts before me the government has not shown any compelling reasons, evidentiary or otherwise, for its continued retention of Katz' auto, nor has it carried its burden of establishing a reasonable basis for forfeiture of such vehicle. This branch of defendant's motion, then, is granted.

Settle order in accordance with the foregoing.

---

7. See United States v. DeVivo, 190 F.Supp. 483 (E.D.N.Y. 1961).