# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76312-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| MICHELLE DAWN NICHOLS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 13, 2018 |
| | ) | |

ANDRUS, J. — Michelle Nichols was unconscious, receiving a transfusion, and heading into surgery when the police authorized a warrantless blood draw. She challenges the constitutionality of this action on the night she drove her car head-on into an oncoming vehicle and killed its driver. We conclude exigent circumstances justified drawing Nichols's blood without a search warrant and affirm the conviction for vehicular homicide.

## FACTS

The facts are undisputed. At 8:40 p.m. on February 14, 2015, Nichols drove south on State Route (SR) 525 (also known as SR 20), a two-lane highway on Whidbey Island. She crossed the fog line and struck the guardrail on the right side of the roadway. Her car ricocheted off the guardrail, crossed the centerline, and struck a northbound Honda Accord. The driver, Timothy Keil, died as a result of blunt force trauma injuries sustained in the crash.

Washington State Patrol (WSP) Trooper Nicholas Hagg arrived approximately thirty minutes later. When Trooper Hagg arrived, the collision scene was chaotic. The two cars were blocking all traffic on the only road leading to Whidbey Island, which is the main route for ferry traffic in Clinton. Trooper Hagg coordinated the investigation primarily by himself because other troopers were still en route from Deception Pass or off island. Despite the chaos, Trooper Hagg saw a straight, dry roadway with good visibility and no signs that Nichols had braked before the collision.

Trooper Hagg saw Nichols lying on a stretcher in the back of an ambulance. Six or seven medical personnel inside the ambulance crowded around her working to save her life. Nichols had blood on her face and was flailing and screaming in pain. Trooper Hagg could see Nichols had sustained a compound leg fracture; her broken femur was visible, sticking four inches out from her leg. Because of these injuries, Trooper Hagg could not perform field sobriety tests or detect any signs of alcohol impairment. For the short time he was near Nichols, Trooper Hagg was unable to smell any alcohol. Nichols was airlifted to Harborview Medical Center in Seattle shortly thereafter.

Trooper Hagg interviewed the medical personnel on scene. A firefighter with the South Whidbey Fire Department noted that he smelled alcohol on Nichols while stabilizing her head on a stretcher. Another firefighter told Trooper Hagg that she had seen Nichols earlier that evening at a restaurant and bar in Freeland. But when she greeted Nichols with a hug, she had not smelled the

odor of intoxicants. A registered nurse told Trooper Hagg that Nichols had admitted she had been drinking earlier in the evening.

WSP Trooper Detective Jeffrey Rhue was dispatched to the scene at 10:00 p.m. Detective Rhue had to travel from his home in Stanwood through Deception Pass to reach the collision scene and did not arrive until 11:58 p.m. Trooper Hagg tried to keep Detective Rhue apprised of the evidence he was collecting through repeated cell phone calls, but Trooper Hagg had very poor reception, which "handicapped [him] in performing his duties of coordinating the investigation." In an early conversation, Detective Rhue instructed Trooper Hagg to send another trooper to Harborview to meet with Nichols to verify the odor of intoxicants.

WSP Trooper Hagreen responded to the call and arrived at Harborview's emergency department around 11:10 p.m. He found Nichols with a medical team operating on her protruding femur and pouring liquid into her open abdominal cavity. Trooper Hagreen learned that Nichols, who was by then unconscious, had received two units of blood, was still receiving blood intravenously, and would be undergoing further surgery. Because Nichols was intubated, Trooper Hagreen could not smell the odor of intoxicants. At 11:24 p.m., Trooper Hagreen called Trooper Hagg to report that Nichols was unconscious, sedated, and had received blood transfusions. He also let Haag know that he had been unable to determine Nichols's state of intoxication because of her injuries and ongoing treatment.

Trooper Hagg called Detective Rhue a few minutes later to advise him that Nichols "had already received two bags of blood, and that she was being prepped for surgery—where she was likely to then be given more blood transfusions," which would destroy the evidence of her blood alcohol content. This call was the first in which Trooper Hagg and Detective Rhue did not experience poor cell phone reception. Trooper Hagg detailed the roadway conditions, the layout of the roadway, and the facts of the collision, specifically the lack of braking, and the lack of any other collisions at that location. Because of the poor reception during their previous calls, Detective Rhue had not been made fully aware of the facts of the collision earlier in the evening.

During this uninterrupted call, Trooper Hagg told Detective Rhue that he had learned that Nichols had a driving under the influence charge from 2000, which had been reduced to negligent driving in the first degree. Trooper Hagg also explained that the person who reported smelling intoxicants on Nichols was the person closest to her in the ambulance. Additionally, Trooper Hagg and Detective Rhue discussed the registered nurse's report stating that Nichols had admitted to drinking earlier that evening and had "appeared confused and might have suffered a head trauma." Detective Rhue concluded there was both probable cause and exigent circumstances to draw Nichols's blood without a search warrant.

Trooper Hagg contacted the Island County prosecuting attorney to confirm the troopers could proceed with a warrantless blood draw. Trooper Hagg then called Trooper Hagreen at 11:30 p.m. to ask him to request the blood draw.

Nichols, however, was in the process of getting either a CT scan or X-rays, and the blood draw was delayed another hour. At 12:30 a.m., a registered nurse withdrew two vials of blood in compliance with all procedures required by the Washington State Toxicologist. Trooper Hagreen supervised the blood draw and later placed the blood vials into the Washington State Patrol evidence system. A forensic scientist analyzed the blood and reported that Nichols had a blood ethanol level of 0.11 g/100 mL of blood approximately four hours after the collision.

Nichols was charged with one count of vehicular homicide under chapters 46.61.520(1)(a) and 46.61.502 RCW. She challenged the constitutionality of the warrantless blood draw, arguing that the troopers lacked probable cause to establish she had been driving while intoxicated. She also challenged the admissibility of the blood test results, arguing that the blood taken from her veins was not her blood because it had been adulterated by the blood transfusion.

The trial court conducted a CrR 3.6 hearing. After hearing the testimony of the troopers involved, the court found that Trooper Hagg's ability to obtain a search warrant within a reasonable time was severely compromised by the extremely poor cell phone reception he had at the scene. In order to make cell phone calls, Trooper Hagg had to stand in the middle of the intersection at SR 525/SR 20 and Coles Road and turn in a circle until he got reception. If Trooper Hagg turned around while talking on the phone, the cell phone either cut out or he was unable to hear the person on the other end of the line. He had several dropped cell phone calls while trying to talk to Detective Rhue. The trial court

also found that it would have taken Trooper Hagg two hours to return to his office in Coupeville, prepare a search warrant, and contact an on-call judge to consider the search warrant. And because Trooper Hagg was still waiting for other troopers to arrive to assist with the investigation, it would have been difficult for him to leave an open investigation of a vehicular fatality.

The trial court further found that the troopers became aware of exigent circumstances when Trooper Hagreen told Trooper Hagg that Nichols had received two units of blood and was heading into surgery. The court found it would not have been feasible for Trooper Hagreen, who was at Harborview with Nichols, to prepare a search warrant in a reasonable time because it would have taken him two additional hours to gather the necessary information, with limited cell coverage to connect with Trooper Hagg, from whom he would have to obtain details to complete the search warrant. And in that time, Nichols's blood alcohol level would have been further diluted with blood transfusions.

The trial court concluded that, based on the collective knowledge of the troopers, there was probable cause to believe that Nichols was driving under the influence of intoxicating liquor at the time of the collision. It further concluded that the totality of the circumstances justified a warrantless blood draw under the exigent circumstances exception to the warrant requirement. It denied Nichols's motion to suppress the blood test results.

Nichols filed a second motion to exclude the blood test results. She stipulated that the State met the prima facie requirements of RCW 46.61.506,[1] but contended the blood sample could not be used to prove her blood alcohol level at the time of the collision because the State could not prove that the blood tested was in fact hers. The trial court rejected Nichols's argument and concluded that even with the transfusions, the blood drawn was Nichols's blood for purposes of RCW 46.61.504[2] and WAC 448-14-020.[3] In addition, the trial court concluded that Nichols had failed to prove that the State would be unable to establish the necessary foundational requirements for the admission of the blood test results at trial.

Nichols stipulated at trial that the blood test was accurate, reliable, and taken in compliance with the standards of the Washington State Toxicologist. Nichols also stipulated that her blood alcohol concentration was no less than 0.11 g/100 mL of blood within two hours of the collision and that she did not consume any alcohol after the collision and before the blood draw. Based on these stipulated facts, the trial court found Nichols guilty of vehicular homicide.

---

[1] RCW 46.61.506(3) provides: "Analysis of the person's blood or breath to be considered valid . . . shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose."

[2] The reference to RCW 46.61.504 in the trial court's findings and conclusions was a typographical error. The parties argued and briefed the issue of the admissibility of the blood test results under RCW 46.61.506. Where the pleadings, arguments, and briefing make it clear the parties were referring to the correct statute and the trial court analyzed the issue using the correct legal standard, this court can deem the reference to the wrong statute as an obvious typographical error. See Williams v. Striker, 29 Wn. App. 132, 133 n.2, 627 P.2d 590 (1981).

[3] This regulation sets out the operational protocol for taking blood samples for alcohol analysis.

ANALYSIS

Nichols raises three issues on appeal. She challenges the trial court's conclusion that there was probable cause to conduct the blood draw. She also contends the trial court erred in concluding that exigent circumstances justified taking her blood without a search warrant. Finally, Nichols argues that the blood analyzed by the state toxicologist was not her blood, as required by RCW 46.61.506(3).

Probable Cause

Nichols challenges the trial court's conclusion that probable cause existed to draw her blood. The Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution prohibit warrantless searches and seizures. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Taking a person's blood and testing it constitutes a search and seizure for which a warrant is generally required. Missouri v. McNeely, 569 U.S. 141, 148, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013). Although an exception to the warrant requirement may apply, such as exigent circumstances, id. at 148-49, police still need to establish that given enough time, they would have been able to get a warrant, see United States v. Impink, 728 F.2d 1228, 1231 (9th Cir. 1984). Probable cause is necessary for a warrant to issue. State v. Martines, 184 Wn.2d 83, 90, 355 P.3d 1111 (2015). Therefore, even when asserting an exception to the warrant requirement, police must show probable cause, which exists where there are facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity and where

evidence of the criminal activity can be found at the place to be searched. State v. Maddox, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). In determining whether probable cause is present, courts may consider the experience and expertise of officers, as well as a suspect's prior convictions if for a similar crime. Id. at 511-12.

A determination of probable cause is a mixed question of fact and law. State v. Vasquez, 109 Wn. App. 310, 318, 34 P.3d 1255 (2001). We review challenged findings of fact for substantial evidence and review de novo whether the facts support this legal determination. Id. Unchallenged findings are verities on appeal. State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). Nichols has assigned no error to any of the trial court's factual findings from the suppression hearings.[4] Thus, the only issue for us to decide is whether the undisputed facts support a determination that probable cause existed.

Nichols argues that at the time her blood was drawn, there was no evidence that she had consumed any alcohol or that she was impaired by the consumption of alcohol. But this argument ignores the undisputed factual findings—namely that a registered nurse told Trooper Hagg that Nichols had admitted she had been drinking earlier in the evening, and a firefighter closest to Nichols's head inside the ambulance told Trooper Hagg that he had smelled the odor of intoxicants on Nichols while stabilizing her head. Additionally, another firefighter had seen Nichols in a restaurant and bar earlier that evening. In

---

[4] RAP 10.3(g) requires a "separate assignment of error for each finding of fact a party contends was improperly made" with a reference to the finding by number. Nichols failed to provide any separate assignment of error for any of the trial court's findings of fact.

addition to this evidence, Trooper Hagg learned that Nichols had a previous driving under the influence charge. The troopers also testified that the circumstances of the accident itself—a head-on collision on a straight roadway with good visibility in a location with no prior accidents and no evidence of any braking before impact—strongly suggested no other probable explanation than that Nichols was driving under the influence of alcohol. The unchallenged findings of fact support the legal conclusion there was probable cause to draw Nichols's blood based on the belief that she had committed the crime of vehicular homicide.[5]

Nichols asserts the troopers supplemented the missing elements of probable cause through the exigent circumstances exception when they could find no additional evidence of intoxication. We disagree with this characterization of events. Trooper Hagg and Detective Rhue made the decision to send a trooper to Harborview in an attempt to collect as much evidence as possible before contacting a judge for a search warrant. At the time they made that decision, they were unaware that Nichols was on the verge of surgery or receiving blood transfusions. We will not use the unfair advantage of hindsight to second guess the professional judgment they exercised in conducting the investigation. Cf. Staats v. Brown, 139 Wn.2d 757, 774, 991 P.2d 615 (2000) (in excessive force context, courts cannot judge reasonableness through hindsight because "police officers are often forced to make split-second judgments in

---

[5] RCW 46.61.520(1)(a) provides that "[w]hen the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor

tense, uncertain, and rapidly evolving circumstances"). Moreover, it was not until 11:30 p.m. when Trooper Hagg relayed the details of his investigation to Detective Rhue that the troopers had all relevant information to make the probable cause determination. And when they came to the conclusion they had probable cause, they were also confronted with the risk of losing evidence due to the blood transfusions and losing access to Nichols due to her impending surgery. The troopers did not unreasonably delay in making their probable cause assessment.

### Exigent Circumstances

The State drew Nichols's blood without a search warrant because of the exigencies of this case. One of the few "'narrowly drawn' exceptions" to the warrant requirement is exigent circumstances. Garvin, 166 Wn.2d at 249-50 (quoting State v. Jones, 146 Wn.2d 328, 335, 45 P.3d 1062 (2002)). The Washington State Supreme Court has identified several circumstances that could be considered "exigent," one of which is the destruction of evidence. State v. Counts, 99 Wn.2d 54, 60, 659 P.2d 1087 (1983). The mere risk that evidence may be destroyed does not mean that exigent circumstances justify a warrantless search in all cases. State v. Tibbles, 169 Wn.2d 364, 370, 236 P.3d 885 (2010). Rather, a court "must look to the totality of the circumstances in determining whether exigent circumstances exist," id., including whether "less intrusive options were available." State v. Cruz, 195 Wn. App. 120, 127, 380 P.3d 599 (2016).

---

vehicle . . . [w]hile under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502."

Furthermore, there must be more than "mere suspicion that evidence may be present . . . ; rather, there must be a 'finding of probable cause coupled with exigent circumstances.'" Impink, 728 F.2d at 1231 (quoting United States v. Stanley, 545 F.2d 661, 664 (9th Cir. 1976)). The impracticality of obtaining a warrant is the focus of the exigent circumstances exception. State v. Audley, 77 Wn. App. 897, 905, 894 P.2d 1359 (1995); see also Tibbles, 169 Wn.2d at 371. The State must show by clear and convincing evidence that the search falls within the exigent circumstance exception. Garvin, 166 Wn.2d at 249-50. "Clear and convincing evidence creates a conviction that the factual contention is 'highly probable.'" United States v. Yi, 704 F.3d 800, 806 (9th Cir. 2013) (quoting Colorado v. New Mexico, 467 U.S. 310, 316, 104 S. Ct. 2433, 81 L. Ed. 2d 247 (1984)). Whether exigent circumstances exist to justify a warrantless blood test is a legal question this court reviews de novo. City of Seattle v. Pearson, 192 Wn. App. 802, 811-12, 369 P.3d 194 (2016).

In Missouri v. McNeely, the United States Supreme Court held that the natural dissipation of alcohol in the bloodstream alone did not justify a warrantless blood draw of a suspected drunk driver. 569 U.S. 141, 165, 133 S. Ct. 1552, 185 L. Ed. 2d 696, 702 (2013). The Fourth Amendment requires officers to obtain a warrant where they can do so within a reasonable time and where it will not significantly undermine the efficacy of the search. Id. at 152. RCW 46.20.308(3) was amended after McNeely to provide that a blood test could be administered without consent only pursuant to a search warrant, a valid

waiver of the warrant requirement, or when exigent circumstances exist. See LAWS OF 2013, 2d Spec. Sess., ch. 35, § 36.

Nichols relies on Pearson to argue that the State failed to prove that troopers could not obtain a search warrant in a timely manner. In that case, Pearson appealed a conviction for driving under the influence of marijuana, arguing that exigent circumstances did not justify a warrantless blood draw. Pearson, 192 Wn. App. at 806-07. This Court held that the natural dissipation of tetrahydrocannabinol (THC) in a suspect's bloodstream constitutes an exigency sufficient to forgo the warrant requirement "only if the party seeking to introduce evidence of a warrantless blood test can show that waiting to obtain a warrant would result in losing evidence of the defendant's intoxication." Id. at 813. Testimony in that case demonstrated that there were at least eight officers present on the scene of Pearson's accident on a heavily travelled road in Seattle. Id. at 816. Further testimony established that available officers could have obtained a search warrant by email or telephone within 60 to 90 minutes, and there was no explanation for why they had not tried to obtain a warrant. Id. Because the City failed to show by clear and convincing evidence that waiting for a warrant would result in the loss of evidence of intoxication, "the natural dissipation of THC in Pearson's bloodstream alone did not constitute an exigency sufficient to bypass the warrant requirement." Id.

Pearson is distinguishable. First, in the present case, there were a limited number of troopers available to maintain public safety at the collision scene, conduct the investigation, and obtain a search warrant. Trooper Hagg was alone

at a rural, serious two-vehicle, fatality accident site. The other troopers called to assist did not arrive until much later—Trooper Larsen arrived at 9:45 p.m.; Trooper Hainer arrived at 10:07 p.m.; and Detective Rhue arrived at midnight. As the trial court found:

> [t]here were limited Washington State Patrol Troopers on the scene to help investigate. Most, up until the time the blood draw was taken, were en route to the scene; either coming to the mainland by way of Deception Pass on North Whidbey or by way of the ferry on South Whidbey.

Because of this, Trooper Hagg coordinated the entire investigation primarily on his own. It would have been difficult for Trooper Hagg to leave the open investigation to return to his office to prepare a search warrant.

In addition, contrary to Nichols's assertion, this court in Pearson did not require the City to show it tried to, but was unable to obtain a warrant. Rather, we concluded "[t]he City failed to satisfy its heavy burden to show by clear and convincing evidence that a warrant could not have been obtained in a reasonable time." Pearson, 192 Wn. App. at 815. Unlike the officers in Pearson, Trooper Hagg had limited cell phone reception, which impaired his ability to gather information about Nichols's condition from Trooper Hagreen, to connect with Detective Rhue, who was driving to the accident site, and to contact a judge for a search warrant.

The trial court detailed the obstacles poor cell phone reception presented for Trooper Hagg that night:

> 5. In order to make cell calls, Trooper Hagg had to go 1) to the intersection of Coles Road and [SR 525/]SR 20, 2) stand in the middle of the intersection, and 3) turn in a circle until he got cell reception.

6. If Trooper Hagg turned away from his original position, the cell phone call would cut out or the person's voice on the call would be so inaudible that he would have to hang up and try to call again.

7. The best reception Trooper Hagg could get were two bars of cellular reception out of the extended network. It was only one bar of reception on his regular Sprint network, which was fine at his home and in Anacortes but did not work reliably at the scene.

8. Trooper Hagg had several dropped phone calls while he was trying to talk to WSP Detective Rhue, who was experiencing his own poor cell reception while driving to the scene.

9. Trooper Hagg had no ability to have a search warrant prepared at the accident scene considering his lack of reliable cell phone service and lack of backup troopers.

10. Under good conditions, which these were not, Trooper Hagg estimated that it would take him two hours to get back to the office in Coupeville, prepare the search warrant, and contact an on-call judge to consider the search warrant.

Nichols has not challenged any of these findings of fact on appeal. Thus, on the record before us, there is clear and convincing evidence that the troopers could not obtain a warrant in a reasonable time. See State v. Inman, 2 Wn. App. 2d 281, 291-93, 409 P.3d 1138 (2018) (exigent circumstances existed for warrantless blood draw in rural location with unreliable cell phone coverage and suspected drunk driver with serious injuries requiring ongoing medical treatment); but see Tibbles, 169 Wn.2d at 370 (finding no exigent circumstances where State did not "establish[] that obtaining a warrant was otherwise impracticable" because record contained no evidence of steps needed to procure a warrant).

Finally, the severity of Nichols's injuries and the blood transfusions complicated this investigation. Trooper Hagg could not conduct field sobriety tests or observe any obvious signs of intoxication because Nichols was airlifted to Harborview for treatment of her life-threatening injuries shortly after Trooper

Hagg arrived on scene. Later, Trooper Hagg learned that Nichols was intubated, making it difficult for Trooper Hagreen to detect an odor of intoxicants, and she had received two units of blood and was likely to need more. The troopers were concerned that the transfusions would dilute any blood alcohol in her system. Troopers Hagg and Hagreen also learned that Nichols was being prepared for surgery, limiting her availability for a blood draw. The blood transfusions and imminent surgeries made the situation a true emergency, necessitating more intrusive means to determine Nichols's intoxication. The officers in Pearson faced none of these logistical or factual problems. The record here is much different than in Pearson. In this case, the trial court explicitly found that Trooper Hagg and his colleagues would have faced incredible difficulties in obtaining a warrant in a timely manner. It specifically found that in the time it would have taken to obtain a warrant, Nichols's blood alcohol level would have been further diluted with blood transfusions. Thus, Pearson does not support Nichols's appeal.

In Schmerber v. California, a pre-McNeely case, the Supreme Court upheld a warrantless blood draw of a drunk driver because of the time it took to investigate the accident scene and to transport the defendant to the hospital for treatment of injuries sustained in the accident. 384 U.S. 757, 771, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). The Washington State Supreme Court recently followed Schmerber in holding that the totality of the circumstances, including the time lost in transporting a defendant to the hospital for treatment and in investigating the accident scene, are important considerations when evaluating

exigency. State v. Baird, 187 Wn.2d 210, 220, 386 P.3d 239 (2016). The trial court properly considered all this evidence when it found exigent circumstances in this case.

Given the totality of circumstances, we hold the trial court did not err in concluding that the exigencies of the case justified a warrantless blood draw because the State showed by clear and convincing evidence[6] that it was impractical to obtain a warrant in a timely manner and highly probable that evidence would be destroyed if troopers further delayed by obtaining a search warrant.

Admissibility of Blood Test Results

A person is guilty of vehicular homicide when she operates a motor vehicle "while under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502," and causes the death of any person. RCW 46.61.520(1)(a). A person is deemed to be under the influence if she has an alcohol concentration level of 0.08 or higher as shown by an analysis of her blood under RCW 46.61.506. RCW 46.61.502(1)(a). RCW 46.61.506(3) provides:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose.

---

[6] Nichols maintains the trial court failed to apply the clear and convincing evidence standard when concluding that exigent circumstances justified the warrantless blood draw. The State cited the trial court to the correct standard in opposing the motion to suppress. Furthermore, whether exigent circumstances exist to justify a warrantless blood test is a legal question this court reviews de novo. Pearson, 192 Wn. App. at 811-12. Based on the record before us, in particular the unchallenged findings, the State met its burden to show by clear and convincing evidence that exigent circumstances existed to draw Nichols's blood without a warrant.

(emphasis added).

Nichols argues the blood test results are inadmissible unless the State establishes that it was her blood that was tested. She contends that the blood transfusions raise a question as to whether the blood sample they withdrew from her at Harborview actually belonged to her.

The trial court found that Trooper Hagreen watched as a nurse withdrew blood from Nichols's arm. Nichols does not dispute this finding. Nor does she claim that the blood ultimately tested was blood other than the sample taken from her body. The trial court concluded that once the transfused blood entered Nichols's body, it became her blood for purposes of the statute. We agree. This Court holds that "the person's blood" under RCW 46.61.506[7] and RCW 46.61.502 simply means blood that has been withdrawn from a defendant's body. Because there is no dispute here that the tested blood came from Nichols's veins, we conclude that the trial court did not err in admitting the blood test results at her trial.

We affirm.

WE CONCUR:

_____

_____                    _____

---

[7] Nichols also contends RCW 46.61.506(4)(b) applies only to breath tests, and not to blood tests. Because State v. Brown explicitly states RCW 46.61.506(4)(b) and (c) apply to all of RCW 46.61.506, this contention lacks merit. 145 Wn. App. 62, 69 n.1, 184 P.3d 1284 (2008).